# STATE OF MINNESOTA
# IN COURT OF APPEALS
# A16-0363

In the Matter of Hibbing Taconite Mine and Stockpile Progression
and Williams Creek Project Specific Wetland Mitigation.

**Filed December 5, 2016**
**Affirmed in part, reversed in part, and remanded**
**Reilly, Judge**

Minnesota Department of Natural Resources
OAH Docket No. 11-2004-31655

Gerald W. Von Korff, John C. Kolb, Rinke Noonan, St. Cloud, Minnesota (for relator Lake of the Woods County)

Lori Swanson, Attorney General, Max Kieley, Assistant Attorney General, St. Paul, Minnesota (for respondent Department of Natural Resources)

Susan K. Wiens, William P. Hefner, The Environmental Law Group, Ltd., Minneapolis, Minnesota (for respondent Cliffs Natural Resources Inc.)

Considered and decided by Reilly, Presiding Judge; Halbrooks, Judge; and Johnson, Judge.

## S Y L L A B U S

The authority of the commissioner of natural resources, under Minnesota Statutes section 103G.222 (2014), to approve wetlands replacement for activities requiring a permit to mine does not include the authority to approve the reservation of wetland credits for future use by a permit-to-mine applicant without deposit into the state wetlands bank.

**O P I N I O N**

**REILLY**, Judge

In this certiorari appeal, relator county challenges a final order affirming respondent administrative agency's approval of respondent mine operator's wetland replacement plan. We affirm in part, reverse in part, and remand.

**FACTS**

In January 2014, respondent Cliffs Natural Resources Inc. (Cliffs) submitted to respondent Minnesota Department of Natural Resources (DNR) an application for approval of a wetland replacement plan (the plan or the Cliffs's plan) proposing the restoration of about 432 acres of wetlands at a specified site in Lake of the Woods County (the LOW site). The plan stated that the LOW site was projected to produce approximately 443.34 wetland credits, 14.29 of which were designated for mitigation of wetland impacts of mine progression and stockpile development at Cliffs's mining operation, Hibbing Taconite, and the balance of which were "to be held for future use" to mitigate wetland impacts of any of Cliffs's mining operations' "potential future" activities requiring a permit to mine (PTM). The plan was entitled "Project-Specific Wetland Replacement Plan Hibbing Taconite Mine and Stockpile Progression Project" and was submitted by Cliffs to DNR pursuant to its authority to approve wetland-replacement actions in connection with activities requiring a PTM. *See* Minn. Stat. § 103G.222, subd. 1(a) (2014); Minn. R. 8420.0200, subp. 1.D, .0930, subp. 1 (2015).

Relator Lake of the Woods County (the county) and others submitted to DNR comments opposing Cliffs's plan based on "numerous technical issues and its

2

inconsistency with the Wetland Conservation Act." The county also asserted that the plan, despite its title, was not a wetland replacement plan subject solely to DNR approval, but rather a wetland banking plan subject to specific regulatory requirements and oversight by the Minnesota Board of Water and Soil Resources (BWSR). *See* Minn. Stat. § 103G.2242, subd. 9 (2014); Minn. R. 8420.0700-.0820 (2015).

DNR issued a notice of decision approving the plan as a replacement plan and directing that "any person aggrieved by this decision may appeal the decision in the manner provided for a contested case hearing." The county both petitioned DNR for contested-case proceedings and submitted an appeal to BWSR, asserting that the proper avenue of review was the appeal to BWSR. BWSR held the county's appeal in abeyance, and DNR ordered contested-case proceedings before the Minnesota Office of Administrative Hearings (OAH) to adjudicate three issues:

> 1. Was the Commissioner's approval of [the Cliffs's plan] issued in conjunction with a valid [PTM] and an approved mining reclamation plan pursuant to the requirements of Minn. Stat. § 103G.222, subd. 1 (2012)?
>
> 2. If there are surplus wetland mitigation credits developed by Cliffs [under its plan], can they be used to mitigate mining-related wetland impacts at Cliffs' mining operations . . . pursuant to Minn. R. 8420.0930, subp. 4A (2013) without being deposited in a state wetland bank?
>
> 3. Did the Commissioner have cause to approve [the Cliffs's plan] pursuant to Minn. Stat. § 103G.222, subd. 1 (2012) and Minn. R 8420.0930 (2013)?

Cliffs successfully petitioned to intervene and brought a motion to dismiss the contested-case proceedings for lack of jurisdiction or, alternatively, to limit the proceedings to review

on the administrative record. Both the county and DNR opposed Cliffs's motion to dismiss or to limit the proceedings, and the administrative-law judge (the ALJ) denied the motion.

DNR moved for partial summary disposition, which Cliffs supported and the county opposed. The ALJ issued an order recommending summary disposition in favor of DNR on Issues 1 and 2, and the parties entered into a settlement agreement resolving Issue 3. The ALJ issued an order recommending dismissal of the contested-case proceedings, in light of the partial summary-disposition recommendation and the parties' settlement agreement.

After receiving written arguments, the commissioner of natural resources (the commissioner) issued a final order adopting with modification the ALJ's order denying Cliffs's motion to dismiss the contested-case proceedings for lack of jurisdiction and recommending summary disposition in favor of DNR on Issues 1 and 2; adopting without modification the ALJ's order recommending dismissal of the contested-case proceedings; and affirming DNR's notice of decision approving the plan as modified by the settlement agreement. The final order includes a conclusion that "excess wetland credits from [wetland restoration at] the [LOW] site [may] be used to replace future mining-related [wetland] impacts from mining operations under a [PTM] that is held by [Cliffs]."

The county appeals, arguing that DNR lacked jurisdiction to initiate contested-case proceedings and exceeded its authority in approving the plan.

## ISSUES

I.      Did the county waive or forfeit the issues raised on appeal?

II.      Did DNR exceed its statutory authority in approving Cliffs's plan?

4

# ANALYSIS

This appeal requires us to examine the nature and extent of DNR's authority under the Minnesota Wetland Conservation Act (WCA), Minn. Stat. §§ 103G.221-.2375 (2014), which was adopted by the legislature in 1991 for the purpose of preserving and restoring Minnesota wetlands. *See* Minn. Stat. § 103A.201 (2014); *Drum v. Minn. Bd. of Water & Soil Res.*, 574 N.W.2d 71, 73 (Minn. App. 1998). WCA requires that "[w]etlands must not be drained or filled, wholly or partially, unless replaced by actions that provide at least equal public value under a replacement plan." Minn. Stat. § 103G.222, subd. 1(a). WCA is primarily administered by BWSR in cooperation with soil and water conservation districts and other local government units (LGUs). *Drum*, 574 N.W.2d at 73-74; Minn. Stat. § 103G.005, subd. 10e (2014) (defining local government unit). Generally speaking, to engage in activities potentially impacting wetlands, one must apply to the responsible LGU for no-loss or exemption determinations or for approval of a replacement plan. *See* Minn. Stat. § 103G.2242, subds. 1(a), 1(b), 4. The decisions of LGUs, including a replacement-plan decision, may be appealed to BWSR. *Id.*, subd. 9.

In an exception to the general LGU-BWSR procedure, WCA authorizes DNR to approve replacement plans for wetland impacts resulting from activities requiring a PTM under Minnesota Statutes section 93.481 (2014). Minn. Stat. § 103G.222, subd. 1(a). As to wetland impacts resulting from activities requiring a PTM, wetland replacement must take place under a mining reclamation plan approved by the commissioner. *Id.* "Mining reclamation plans shall apply the same principles and standards for replacing wetlands that are applicable to mitigation plans approved as provided in section 103G.2242." *Id.* DNR's

5

approval of wetland replacement under a mining reclamation plan is subject to review through a contested-case proceeding. *See* Minn. Stat. § 93.50 (2014) (providing for review under chapter 14).

Pursuant to its authority under WCA, BWSR promulgated rules in 1993 establishing a state wetland banking system. *See* Minn. Stat. § 103G.2242, subd. 1(a); Minn. R. 8420.0700-.0820. The state wetland bank is "a system of identifying wetlands restored or created for replacement credit and providing for, facilitating, and tracking the exchange of wetland banking credits for projects that require replacement plans or wetland mitigation required by other local, state, or federal authorities." Minn. R. 8420.0111, subp. 67 (2015). Deposits into the state wetland bank are accomplished through an application to the responsible LGU. Minn. R. 8420.0705, .0725. A banking plan application must be reviewed by a technical evaluation panel (TEP), which may recommend certain changes or additions before LGU approval. Minn. R. 8420.0705, subp. 3. LGU's banking-plan decisions may be appealed to BWSR. Minn. R. 8420.0905 (2015).

The expressed "purpose of the state wetland banking system is to provide a market-based structure that allows for replacement of unavoidable impacts with preestablished replacement wetlands." Minn. R. 8420.0700. The system may also be used by an applicant seeking to preserve wetland credits solely for its own future use. *See* Minn. Stat. § 103G.2242, subd. 14(b) (permitting lower fees for "single-user or other dedicated wetland banking accounts"). In 2011, the legislature passed amendments to WCA addressing the use of the wetland bank in connection with activities requiring a PTM. The amendments designate DNR as the LGU "for wetland banking projects established solely

6

for replacing wetland impacts under a [PTM]" and cap the amount of fees that may be assessed for such a banking project. 2011 Minn. Laws ch. 107 §§ 63, 73, at 477, 485, *codified at* Minn. Stat. §§ 103G.005, subd. 10e(4), .2242, subd. 14(c) (2014).

Under BWSR regulations, whether approved by an LGU or DNR, wetland replacement must be completed in advance of or concurrent with the actual wetland impact. Minn. R. 8420.0522, subp. 8.A (2015). Replacement is in advance if it is accomplished by (1) withdrawal of wetland bank credits before the impact, or by (2) project-specific replacement that has reached certain construction milestones. *Id.*, subp. 8.B (2015). The regulations also allow for combined banking and project-specific replacement through submission of both a banking plan and a corresponding replacement plan. *See* Minn. R. 8420.0705, subp. 4.

This appeal stems from DNR's established practice of allowing PTM applicants to designate and carry over surplus wetland credits for the applicant's use in connection with unspecified future PTM activities, without depositing the credits into the state wetland bank. DNR describes its practice as follows:

> [I]f a mining permittee creates a project-specific wetland replacement site to offset wetland impacts arising under a PTM, surplus wetland mitigation credits generated at the wetland replacement site (i.e., any credits that exceed the number of wetland credits needed to mitigate for immediate mining-related wetland impacts) may be held in reserve by the permittee for future mitigation of other mining-related wetland impacts associated with the permittee's mining operations.

Under this practice, review of DNR's initial decision to approve a replacement plan that results in surplus credits may be sought through a contested-case hearing, with a final

7

decision being made by the commissioner. According to DNR, the commissioner's final decision is not subject to review by BWSR. The county objects to this practice.

**I.**

We first address Cliffs's arguments that the county waived some arguments by virtue of the settlement agreement, and forfeited other arguments by failing to raise them during the contested-case proceedings. We address each argument in turn.

**A.      The county did not waive its appellate arguments.**

Cliffs argues that the settlement agreement "definitively resolved" all remaining "disputed factual and legal claims" regarding DNR's treatment of Cliffs's plan as a project-specific replacement plan. "[A] settlement agreement is a contract." *Dykes v. Sukup Mfg. Co.*, 781 N.W.2d 578, 581-82 (Minn. 2010) (citation omitted). Appellate courts "review the language of the contract to determine the intent of the parties." *Id.* at 582 (citation omitted). "When the language is clear and unambiguous, [courts] enforce the agreement of the parties as expressed in the language of the contract." *Id.* (citation omitted). We "must read and interpret contracts, like statutes, as a whole, not as separate isolated provisions." *In re Petition for Distribution of Attorney's Fees*, 870 N.W.2d 755, 768 (Minn. 2015).

In this case, the settlement agreement provides:

> This Settlement includes and is specifically limited to resolution of Issue 3 as identified in [DNR's order for contested-case proceedings before OAH].
>
> . . . .

8

> This Agreement disposes only of Issue 3. Nothing in this Agreement shall prevent any Party from exercising rights to appeal a final decision of [DNR] based on the [ALJ]'s recommendation on summary disposition of Issues 1 and 2 as identified in [the order for contested-case proceedings]. . . .

> All Parties waive their right to appeal from the final decision of [DNR] on Issue 3 as resolved by this Agreement.

Thus we must determine whether the county's arguments arising from DNR's treatment of Cliffs's plan as a project-specific replacement plan relate to Issue 3 and are therefore waived.

Viewing the issues in context, we conclude that Issue 1 addresses DNR's *statutory authority* to approve Cliffs's plan as either a project-specific replacement plan or a banking plan, Issue 2 addresses the *legality* of DNR's treatment of Cliffs's plan as a project-specific replacement plan that may produce surplus wetland credits for Cliffs's future use without deposit into the state wetland bank, and Issue 3 addresses the sufficiency of the *evidence* to show that Cliffs's plan meets the technical requirements of a project-specific replacement plan.

Consequently, we conclude that the county's arguments arising from DNR's treatment of Cliffs's plan as a project-specific replacement plan apply to Issue 2—not Issue 3. Because the settlement agreement preserved the parties' right to appeal from the commissioner's ultimate resolution of Issues 1 and 2, the settlement agreement does not preclude our consideration of the county's arguments on appeal.

**B.    The county's appellate arguments are not forfeited.**

Cliffs also argues that the county failed to preserve for appeal its argument that DNR lacked statutory authority to initiate contested-case proceedings on the county's administrative appeal of DNR's plan-approval decision.   Cliffs presents us with two distinct failure-to-preserve, or forfeiture, theories, neither of which we accept.

Cliffs's first theory of forfeiture hinges on its characterization of a paragraph in DNR's notice of its decision to approve Cliffs's plan, which provides:

> Pursuant to Minn. Stat., sec. 93.50, any person aggrieved by this decision may appeal the decision in the manner provided for a contested case hearing under Minn. Stat., Secs. 14.57 to 14.62 and the procedures prescribed in Minn. Rules, parts 1400.5100 to 1400.8500. An appeal of this decision by an aggrieved party must be received by the commissioner within 30 calendar days of the date of the mailing of this Notice.

According to Cliffs, this boilerplate appeals-process language constituted an "appealable final decision" and the only appeal available was through a contested-case hearing.   Cliffs thus claims that the county's "failure [to] file an appeal with this Court within thirty days of its receipt" of the notice of decision precludes our consideration of the county's argument that DNR lacked statutory authority to initiate the contested-case proceedings.

Generally, an administrative agency's "final order, decision or judgment affecting a substantial right" may be appealed to this court.   Minn. R. Civ. App. P. 103.03(g).   An order, decision, or judgment is "final," for purposes of immediate appealability, if it "finally determine[s] some positive legal right belonging to the [would-be appellant]." *McCullough & Sons, Inc. v. City of Vadnais Heights*, 883 N.W.2d 580, 586 (Minn. 2016)

10

(quotation omitted). But "[the supreme court] ha[s] *never* held that an unsuccessful challenge to the subject-matter jurisdiction *of an executive-branch agency* either finally determines a party's legal rights or is immediately appealable." *Beuning Family LP v. County of Stearns*, 817 N.W.2d 122, 127 (Minn. 2012). Indeed, the supreme court has affirmatively stated that "no right . . . is violated when an administrative agency wrongly asserts jurisdiction over a party." *Id.* at 128 (citing *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 43, 58 S. Ct. 459, 460 (1938)).

In this case, the supposedly final decision consists of no more than DNR's formulaic expression of intent to route any *future* administrative appeal of its plan-approval decision through contested-case proceedings before OAH. In light of controlling caselaw establishing that an administrative agency's *actual* assertion of jurisdiction over an *objecting* party is not immediately appealable by that party, *Beuning Family LP*, 817 N.W.2d at 127-28, Cliffs's first forfeiture theory is meritless.

Cliffs's second forfeiture theory is that the county failed to challenge in the contested-case proceedings DNR's statutory authority to initiate contested-case proceedings on the county's administrative appeal of DNR's plan-approval decision. Cliffs is correct that "[g]enerally, failure to raise an issue in an administrative proceeding precludes review on appeal." *Riley v. Jankowski*, 713 N.W.2d 379, 398 (Minn. App. 2006), *review denied* (Minn. July 19, 2006) (citation omitted). And here, the county did not just neglect to raise the issue during the contested-case proceedings; the county itself demanded DNR's initiation of those proceedings, albeit with a reservation of rights. And when Cliffs challenged OAH's jurisdiction, arguing in part that DNR lacked statutory authority to

11

initiate the contested-case proceedings before OAH, the county opposed Cliffs's motion to dismiss for lack of jurisdiction. In its opposition, the county argued that OAH had jurisdiction to hear the appeal; the county neither mentioned its BWSR appeal nor characterized its invocation of the contested-case proceedings as "protective" or made only "under protest."

We are reminded of "the doctrine of invited error[,] which precludes a party from asserting error on appeal which he invited or could have prevented in the court below." *Krenik v. Westerman*, 201 Minn. 255, 262, 275 N.W. 849, 852 (1937). But we do not apply that doctrine here because, if the DNR did not have statutory authority to initiate the contested-case proceedings that culminated in the commissioner's issuance of the final order, then that order is void. *See Senior Citizens Coal. of Ne. Minn. v. Minn. Pub. Utils. Comm'n*, 355 N.W.2d 295, 302 (Minn. 1984) (stating that because an administrative agency's "lack of statutory authority betokens a lack of jurisdiction," an agency decision "rendered either without statutory authority or in excess of the authority granted" is void); *see also Rowe v. Dep't of Emp't & Econ. Dev.*, 704 N.W.2d 191, 194 (Minn. App. 2005) ("An agency's action taken without statutory authority ordinarily is void."). *Cf. Nelson v. Schlener*, 859 N.W.2d 288, 291-92 (Minn. 2015) ("[D]efects in subject matter jurisdiction can be raised at any time and cannot be waived by the parties.").[1] We therefore conclude that the county has not forfeited its arguments and we proceed to the merits of the appeal.

---

[1] During oral argument, DNR reframed and reiterated Cliffs's second forfeiture theory. The county subsequently filed with this court a letter supplying record citations to refute that theory; Cliffs and DNR promptly filed with this court their objections to and requests to strike the county's post-hearing submission. Because the county did not have leave to

12

## II.

"Summary disposition is the administrative equivalent of summary judgment." *In re Gillette Children's Specialty Healthcare*, 883 N.W.2d 778, 785 (Minn. 2016) (quotation omitted). "A contested case may be resolved on a motion for summary disposition 'where there is no genuine issue as to any material fact.'" *Id*. (quoting Minn. R. 1400.5500(K) (2015)). Appellate review of an order granting summary disposition is governed by the Minnesota Administrative Procedure Act (MAPA), Minnesota Statutes sections 14.001-.69 (2014). *Id*.

Under MAPA, an appellate court may overturn or modify an administrative agency's final decision in a contested case

> if the substantial rights of the petitioners may have been prejudiced because the administrative finding, inferences, conclusion, or decisions are:
>
>     (a) in violation of constitutional provisions; or
>     (b) in excess of the statutory authority or jurisdiction of the agency; or
>     (c) made upon unlawful procedure; or
>     (d) affected by other error of law; or
>     (e) unsupported by substantial evidence in view of the entire record as submitted; or
>     (f) arbitrary or capricious.

file an additional brief and did not limit its filing to citations of supplemental legal authority, we strike and do not consider the county's post-hearing submission. *See* Minn. R. Civ. App. P. 128.02 (providing that, beyond appellant's brief, respondent's brief, and reply brief, "[n]o further briefs may be filed except with leave of the appellate court"), .05 ("If pertinent and significant *authorities* come to a party's attention . . . after oral argument but before decision, a party may promptly file a letter with the clerk of the appellate courts setting forth the citations." (emphasis added)); Minn. R. Civ. App. P. 128.05 2000 comm. cmt. (cautioning that "[a] submission [of supplemental authority] . . . is not to contain argument" and that "[a] submission . . . that does not conform to the rule is subject to being stricken").

Minn. Stat. § 14.69. "An agency decision generally enjoys a presumption of correctness and will not be reversed unless the party challenging the decision establishes one of the statutory bases for doing so." *In re Valley Branch Watershed Dist.*, 781 N.W.2d 417, 421 (Minn. App. 2010) (citations omitted).

"Administrative agencies are creatures of statute and they have only those powers given to them by the legislature." *In re Hubbard*, 778 N.W.2d 313, 318 (Minn. 2010). When "confronted with the threshold question of whether the legislature has granted an agency the authority to take the action at issue," an appellate court does not "defer to the agency's [own] determination of [its] authority." *Id.* at n.4. Rather, "[w]hether an administrative agency has acted within its statutory authority is a question of law that [appellate courts] review de novo." *Id.* at 318 (citation omitted). "To determine what [an administrative agency's] powers include, we first look to the plain language of the authorizing statute." *Valley Branch Watershed Dist.*, 781 N.W.2d at 421-22. "While express statutory authority need not be given a cramped reading, any enlargement of express powers by implication must be fairly drawn and fairly evident from the agency objectives and powers expressly given by the legislature." *In re Qwest's Wholesale Serv. Quality Standards*, 702 N.W.2d 246, 259 (Minn. 2005) (emphasis omitted) (quotation omitted). "[I]f the statutory language leaves any uncertainty as to an agency's authority, we resolve that uncertainty 'against the exercise of such authority.'" *Valley Branch Watershed Dist.*, 781 N.W.2d at 422 (quoting *Qwest's Wholesale Serv.*, 702 N.W.2d at 259).

14

**A.  DNR did not lack statutory authority to initiate contested-case proceedings; the commissioner did not lack jurisdiction to issue the final order.**

The county argues that DNR lacked statutory authority to initiate the contested-case proceedings, such that the commissioner lacked jurisdiction to issue the final order. The county notes that "BWSR has been expressly granted review authority over wetland . . . banking determinations" and that "BWSR, not DNR, is the agency charged with resolving banking disputes." The county claims that it follows that BWSR had exclusive jurisdiction to make the final agency decision regarding whether Cliffs's restoration plan was a banking plan or a project-specific replacement plan. Essentially, the county asserts that because its administrative appeal of DNR's plan-approval decision challenged DNR's characterization of Cliffs's restoration plan as a project-specific replacement plan rather than a banking plan, that appeal should have been heard by BWSR.

As we note above, DNR is authorized under WCA to approve wetland replacement plans in connection with activities requiring a PTM. *See* Minn. Stat. § 103G.222, subd. 1(a); Minn. R. 8420.0200, subp. 1.D (designating DNR as "the approving authority for activities associated with projects requiring [PTMs]"), .0930, subp. 1 ("Wetlands must not be impacted as part of a project for which a [PTM] is required by Minnesota Statutes, section 93.481, except as approved by the commissioner."). And "[a]ny person aggrieved by any order, ruling, or decision of the commissioner may appeal such order, ruling, or decision in the manner provided in chapter 14," Minn. Stat. § 93.50, which, inter alia, provides procedures for administrative appeal by contested-case proceedings, *see generally* Minn. Stat. §§ 14.57-.62 (describing contested-case procedures).

15

In contrast, wetland-banking applications related to activities requiring PTMs are subject only to initial approval by DNR, with a right of appeal to BWSR. *See* Minn. Stat. §§ 103G.005, subd. 10e (designating the commissioner as the "[LGU] . . . for wetland banking projects established solely for replacing wetland impacts under a [PTM]"), .2242, subd. 9 (providing for appeal to BWSR of decisions by LGUs, including decisions on wetland banking); *see also* Minn. R. 8420.0111, subp. 8 (2015) ("'Application' means a formal request for a decision by a[n] [LGU] . . . for," inter alia, a "banking plan."), .0905, subp. 3 ("The decision of a[n] [LGU] to approve, approve with conditions, or deny an application is final if not appealed to the *board* within 30 days . . . ." (emphasis added)).

Both Cliffs and DNR treated Cliffs's plan as a project-specific replacement plan rather than a banking plan;[2] Cliffs has made no application to deposit surplus wetland credits resulting from replacement actions at the LOW site into the state wetland bank.[3] Moreover, the county points to no authority indicating that an aggrieved party's mere

---

[2] The county makes much of the fact that an August 14, 2012 version of Cliffs's plan did designate the plan as a "wetland bank" plan. But a May 3, 2013 version of the plan designated the plan as a "project-specific wetland mitigation plan," and a January 21, 2014 version of the plan designated the plan as a "project-specific wetland replacement plan." The August 14, 2012 version of the plan was never approved by DNR and the terminology used therein is, therefore, irrelevant to the question before us, i.e., whether DNR had jurisdiction to hear the county's administrative appeal of DNR's approval of the May 3, 2013 and January 21, 2014 versions of the plan.

[3] For this reason, we reject the county's argument that DNR erred by not treating Cliffs's plan as a banking plan. Deposits into the state wetland bank require affirmative application, *see* Minn. R. 8420.0705, which was not made here. We believe the more apt inquiry is whether DNR was authorized to approve, as part of a replacement plan, Cliffs's reservation of surplus wetland credits for use in connection with its unspecified future PTM activities. We address that issue below.

16

*allegation* of plan mischaracterization overrides, for purposes of administrative-appeal jurisdiction, DNR's acceptance of a plan's designation by the applicant that submitted the plan. Consequently, we conclude that the commissioner had jurisdiction to issue the final order.

**B.      DNR lacks statutory authority to approve Cliffs's reservation of surplus wetland credits without deposit into the state wetland bank.**

Although stated variously in its briefs, the county's remaining arguments boil down to its assertion that DNR lacks authority to essentially operate its own wetlands bank by allowing PTM applicants to reserve credits in project-specific wetlands replacement plans for use in relation to later mining activity. We agree that DNR exceeded its authority in this regard.

DNR is authorized under Minnesota Statutes section 103.222, subdivision 1(a), to approve the replacement of wetlands drained or filled by activities requiring a PTM. The statute does not expressly address whether DNR may allow a PTM applicant to reserve surplus wetland credits for future use without depositing them into the state wetlands bank. As we note above, however, the statutes and regulations create a procedural path for those conducting activities requiring a PTM to deposit wetlands credits into single-user wetland bank accounts. *See* Minn. Stat. §§ 103G.005, subd. 10i, .2242, subd. 14(b)-(c); Minn. R. 8420.0705, subp. 4. Like other deposits to the wetlands bank, a deposit by a PTM applicant is initially subject to approval by an LGU (DNR) whose decision may be appealed to BWSR. Minn. R. 8420.0705, .0905. DNR acknowledges the availability of this path, but

17

asserts that PTM applicants are not required to use this path to reserve surplus credits. For the reasons that follow, we reject this assertion.

"[Appellate courts] are to read and construe a statute as a whole and must interpret each section in light of the surrounding sections to avoid conflicting interpretations." *Am. Family Ins. Grp. v. Schroedl*, 616 N.W.2d 273, 277 (Minn. 2000); *see also* Minn. Stat. § 645.17(2) (2014) (stating presumption that "the legislature intends the entire statute to be effective and certain"). "While statutory construction focuses on the language of the provision at issue, it is sometimes necessary to analyze that provision in the context of surrounding sections." *Id.*; *see also Star Windshield Repair, Inc. v. W. Nat'l Ins. Co.*, 768 N.W.2d 346, 350 (Minn. 2009) (analyzing comprehensive statutory framework to determine permissibility of conduct not expressly addressed by statute). WCA and BWSR rules create a comprehensive statutory and regulatory structure governing wetlands replacement and banking. It is in this context that we must determine the scope of DNR's authority to approve wetlands replacement under Minnesota Statutes section 103G.222, subdivision 1(a).

Viewing the statute contextually, we conclude that Minnesota Statutes section 103G.222, subdivision 1(a), does not authorize DNR to approve the reservation of wetland credits for future use by a PTM applicant without deposit into the state wetlands bank. Although DNR is generally authorized to approve wetland replacement plans for activities requiring a PTM, both the statutes and rules contemplate the deposit of surplus credits from activities requiring a PTM into the state wetlands bank. Minn. Stat. §§ 103G.005, subd. 10i, .2242, subd. 14(b)-(c); Minn. R. 8420.0705, subp. 4. Under DNR's

18

preferred interpretation, and given its current practice, these provisions would be unlikely to gain much use. Because we presume that the legislature intended the statutory provisions to be effective, we cannot accept DNR's interpretation. *See* Minn. Stat. § 645.17(2).

DNR asserts that non-banking reservation of surplus wetland credits is permissible because of its long-standing interpretation of "project" in the context of "project specific replacement" to mean "mining operations under a PTM." As we note above, "project-specific replacement" is used in Minnesota Rule 8420.0522, subpart 8, to identify one of two possible sources of in-advance wetland replacement, the second possible source being credits from the state wetland bank. *See also* Minn. R. 8420.0111, subp. 55 (2015) (defining "project-specific" to mean that "the applicant for a replacement plan approval provides the replacement as part of the project, rather than attain the replacement from a wetland bank"). Even if we accept DNR's interpretation of "project," however, we can discern nothing in the relevant statutes or rules that authorizes DNR to approve the reservation of surplus wetland credits for use in connection with an applicant's unspecified future PTM activities. The only mechanism for achieving that result is through the banking process authorized by law.

DNR also argues that it is authorized to approve non-banking reservation of surplus wetland credits by Minnesota Rule 8420.0930, subpart 4.A, which provides that "[r]eplacement wetlands approved under this part must only be used for mining-related impacts covered under a [PTM] unless the credits are approved and deposited in the state wetland bank." DNR is incorrect. One may engage in wetland replacement actions

19

resulting in wetland credits eligible for deposit in the state wetland bank for future use in connection with wetland impacts resulting from activities that may or may not require a PTM. *See generally* Minn. R. 8420.0705, .0725, .0745. Distinctly, one may pursue a "wetland banking project[] established solely for replacing wetland impacts under a [PTM]," Minn. Stat. § 103G.005, subd. 10e; any wetland credits resulting from such a project are eligible for deposit in a "dedicated wetland banking account," Minn. Stat. § 103G.2242, subd. 14(c). The rule on which DNR attempts to rely does no more than clarify that such credits may be used to replace only wetland impacts that are caused by activities requiring a PTM. *See* Minn. R. 8420.0930, subp. 4.A.

## D E C I S I O N

The county has not challenged DNR's approval of 14.29 wetland credits for mitigation of wetland impacts of mine progression and stockpile development at Hibbing Taconite, and we affirm the commissioner's final order in that regard. But because DNR exceeded its statutory authority by approving Cliffs's reservation of surplus credits for use in connection with its unspecified future PTM activities, we reverse the final order in relevant part and remand for further proceedings consistent with this opinion.

**Affirmed in part, reversed in part, and remanded.**