# STATE OF MINNESOTA
## IN COURT OF APPEALS
### A23-0064

Minnesota Internship Center,
Relator,

vs.

Minnesota Department of Education,
Respondent.

**Filed September 25, 2023**
**Affirmed**
**Cochran, Judge**

Minnesota Department of Education

Jack Y. Perry, Brayanna J. Bergstrom, Taft Stettinius & Hollister LLP, Minneapolis, Minnesota; and

John Cairns, John Cairns Law, P.A., Minneapolis, Minnesota (for relator)

Keith Ellison, Attorney General, Alec Sloan, Martha J. Casserly, Assistant Attorneys General, St. Paul, Minnesota (for respondent)

Considered and decided by Wheelock, Presiding Judge; Cochran, Judge; and Frisch, Judge.

## SYLLABUS

1.      Minnesota Statutes section 127A.41, subdivision 3 (2022), when read in conjunction with Minnesota Statutes section 124E.16, subdivision 1(a) (2022), authorizes the commissioner of education to conduct audits of charter school records "for the purpose of verifying" pupil counts and state aid entitlements.

2.      The authority of the commissioner under section 127A.41, subdivision 3, to conduct audits and to order "increases or decreases" in state aid based on audit results is

separate from and is not limited by the authority of the commissioner to "reduce or withhold" state aid for violations of law under Minnesota Statutes section 127A.42 (2022).

## OPINION

**COCHRAN**, Judge

In this certiorari appeal, relator Minnesota Internship Center (MNIC) challenges a decision by the commissioner of education ordering a downward adjustment to the amount of state education aid received by MNIC after an audit by respondent Minnesota Department of Education (MDE) found that MNIC had overreported the number of students attending its charter school. MNIC principally argues that MDE lacked authority to conduct the audit and order adjustments to MNIC's state aid because (1) MDE conducted the audit under Minnesota Statutes section 127A.41, subdivision 3, which MNIC contends is inapplicable to charter schools, and (2) the audit was an investigation of a violation of law that MDE could only pursue under a different statutory provision, Minnesota Statutes section 127A.42. In the alternative, MNIC argues that the commissioner's decision to reduce MNIC's state aid is arbitrary and not supported by substantial evidence.

We first conclude that the commissioner has the authority under section 127A.41, subdivision 3, to audit the records of charter schools and to order adjustments in state aid based on the audit results. We next determine that, under the facts of this case, MDE was not required to proceed under section 127A.42 instead of section 127A.41, subdivision 3. Finally, we conclude that the commissioner's decision is not arbitrary and is supported by substantial evidence. Accordingly, we affirm.

**FACTS**

The commissioner of education is charged with distributing state aid to Minnesota school districts and charter schools,[1] including the two types of aid at issue in this appeal: general education revenue and compensatory education revenue. *See* Minn. Stat. § 126C.10, subd. 1 (defining general education revenue), subd. 3 (defining compensatory education revenue) (2022). General-education-revenue entitlement is calculated in part based on the district's or charter school's average daily membership (ADM).[2] *See* Minn. Stat. §§ 126C.05, subds. 1, 5, 8, .10, subds. 1-2e (2022). Compensatory-education-revenue entitlement is calculated in part based on the number of students eligible for free or reduced-price lunch who were enrolled in the district or charter school on October 1 of the previous fiscal year. *See* Minn. Stat. §§ 126C.05, subd. 3, .10, subd. 3 (2022). To ensure complete and accurate records for purposes of calculating state aid, MDE requires districts and charter schools to maintain a record of each student's

---

[1] The Minnesota Education Code defines "district" as "a school district." Minn. Stat. § 120A.05, subd. 8 (2022). Charter schools are public schools, entitled to receive state aid in the same manner as districts. Minn. Stat. §§ 124E.03, subd. 1, .20, subd. 1, .24(a), (c) (2022). The Education Code does not define "charter school" but it classifies "districts" as "common, independent, special, or *charter districts*." Minn. Stat. § 123A.55 (2022) (emphasis added). And this court has held that "charter districts" means "charter schools." *Tipka v. Lincoln Int'l Charter Sch.*, 864 N.W.2d 371, 375 (Minn. App. 2015). Thus, the commissioner must distribute state aid to all Minnesota school districts and charter schools.

[2] ADM equals the sum for all pupils of the number of days of the school year that each student is enrolled in the district or charter school, divided by the number of days that school was in session. Minn. Stat. § 126C.05, subd. 8(a) (2022). A student is "enrolled" in a district or charter school from the date of entry until the date of withdrawal. *Id.* If a student is absent for 15 consecutive school days during the regular school year, the student is considered "withdrawn" and cannot be included in ADM. *Id.*

3

attendance, including entrance and withdrawal dates, for a minimum of three years. *See* Minn. Stat. § 127A.41, subd. 5 (2022) (requiring districts to keep "a record of each pupil's daily attendance, with entrance and withdrawal dates" for at least three years).

MNIC is a non-profit corporation that operates a charter school in Minneapolis. MNIC is authorized by Pillsbury United Communities (Pillsbury).[3] In fiscal year (FY) 2018, which spanned the 2017-18 school year, MNIC reported having 845 students enrolled and an ADM of 520.98. MNIC reported this information to MDE through the Minnesota Automated Reporting Student System (MARSS). As a result, MDE distributed $5,747,413.51 in general education revenue to MNIC for FY 2018. For FY 2019, MNIC reported that 485 students were eligible for free or reduced-price lunch based on their attendance during FY 2018. Consequently, MDE distributed $1,587,717.30 in compensatory education revenue to MNIC for FY 2019.

On September 17, 2018, MDE received a written complaint alleging that MNIC engaged in several practices that potentially violated state and federal law. One of the alleged practices was manipulation of electronic attendance records to artificially inflate its enrollment and ADM. The complainant specifically alleged that MNIC intentionally refused to drop students after 15 consecutive absences so that the students would not be considered withdrawn and excluded from ADM. MDE notified Pillsbury about the complaint. Pillsbury requested that MNIC respond to the allegations. On

---

[3] An "authorizer" is an organization that may authorize a charter school to operate and must oversee any charter school that it authorizes. Minn. Stat. §§ 124E.05, subd. 1, .06, subd. 4 (2022).

4

October 24, 2018, MNIC provided the following information to Pillsbury regarding its attendance records:

> MNIC records student attendance in two different ways. First, when students enter the school building each day, they sign in on a paper sheet at the front desk. This paper record is then transcribed into the school's [electronic] student information system at the end of each school day. Second, classroom teachers record their attendance for each course section by directly entering the data into the school's student information system. Students who are participating in approved work-based learning programs or who are receiving homebound instruction are marked present for the day.

MNIC sent another letter to Pillsbury on October 31, 2018. In this letter, MNIC acknowledged that the previous administration had manipulated MNIC's electronic attendance records to avoid withdrawing students who had been absent for 15 consecutive school days. MNIC stated that it had started "to cleanup its systems and [would] be completely in compliance [with reporting requirements] by [November 1, 2018]."

*MDE's Audit of MNIC*

As a result of the September 2018 complaint, MDE selected MNIC for an audit. The MDE audit team held an initial meeting with MNIC to gather preliminary information. According to a summary of the meeting, MNIC administrators described MNIC's "attendance process" in the following manner:

> According to school staff in school year 2017-2018, electronic attendance [was] based on the manual daily sign-in sheets. Students [were] required each day to sign in prior to entering the building. School staff [were] present at the school entrance to ensure students properly sign[ed] in each day. Teachers were not responsible for taking attendance throughout the day. The manual daily sign-in sheets were used

to enter attendance in the school's student accounting system where electronic attendance is tracked.

The audit team asked follow-up questions to determine if students could enter the building without signing in or could sign in students other than themselves. MNIC explained that students had to be buzzed into the building in the morning and that the entrance was staffed by school personnel to ensure that students signed in themselves—and only themselves---upon entry. Based on these representations, the audit team understood the daily sign-in sheets (manual attendance records) to be the source documentation for the electronic attendance records.

Shortly after the initial meeting, MNIC provided the audit team with the following attendance records for FY 2018: (1) the original daily sign-in sheets, (2) the electronic attendance records for each student reported as enrolled, and (3) various documents for each student reported as homebound. The audit team followed up with MNIC several times to ask clarifying questions, gather additional information, and obtain missing documentation. The audit team spent more than two years reviewing the documentation it had gathered during its fieldwork.

To assess the reliability of MNIC's FY 2018 attendance records, the audit team compared a sample of 42 students' electronic attendance records with the manual daily sign-in sheets to determine whether the records were consistent with each other. Based on its review, the audit team determined that MNIC's electronic attendance records were not accurate, reliable, or complete. The audit team observed that: (1) students who had not signed in were sometimes marked "present" in the electronic attendance records,

6

(2) students who had signed in were sometimes marked "not present" in the electronic attendance records, and (3) students marked as sick or excused on the daily sign-in sheets were sometimes marked "present" in the electronic attendance records. Based on these findings, the audit team determined that the manual attendance records, which MDE understood to be source documents for the electronic attendance records, did not match the electronic attendance records and that the latter overstated attendance. Accordingly, the audit team concluded that the electronic attendance records were not a sufficient, complete, or reliable form of documentation for purposes of determining FY 2018 enrollment.

As a result, the audit team relied solely on MNIC's manual attendance records to verify MNIC's compliance with its attendance reporting requirements. The audit team recognized that the manual attendance records were incomplete but nevertheless determined that they were the most reliable form of attendance data that MNIC could provide. The audit team reviewed the manual attendance records for all 845 students that MNIC reported as enrolled in MARSS for FY 2018.

After reviewing MNIC's manual attendance records, the audit team found that MNIC overreported the number of students enrolled at MNIC in FY 2018. In relevant part, the audit team found that (1) 412 students were not present on the first day of the reported enrollment period, (2) 427 students were not properly withdrawn after 15 consecutive absences, (3) 70 students were reported as enrolled but did not attend school during their reported enrollment period, (4) 4 students were improperly reported as "homebound,"[4]

---

[4] A student is considered "homebound" for state aid purposes if they are medically confined to their home and they receive educational instruction in the home during the enrollment

7

(5) 69 students were reported with an incorrect start and/or end date, and (6) 44 students were incorrectly reported as enrolled on October 2, 2017.[5]

Based on these and other findings, the audit team determined that MNIC's ADM for FY 2018 should be adjusted downward from 520.98 to 383.70. Using the revised ADM and audited enrollment numbers, the audit team concluded that MNIC was overpaid $868,793.11 in general education revenue for FY 2018 and $487,753.76 in compensatory education revenue for FY 2019, for a total of $1,356,546.87 in excess state aid. The audit team recommended reducing MNIC's future state aid by that amount.

*MNIC's Administrative Appeal of MDE's Audit Findings*

On November 23, 2021, MNIC administratively appealed several of the audit findings and the corresponding recommended adjustments to state aid. MDE appointed an appeal committee, which was charged with reviewing the appeal and making recommendations to the commissioner.

In its appeal filing, MNIC raised several arguments. MNIC first argued that MDE erred by relying solely on MNIC's "unofficial . . . voluntary and unavoidably incomplete" manual attendance records and by "arbitrarily" ignoring MNIC's "official" electronic attendance records when calculating MNIC's ADM. MNIC also challenged MDE's

---

period. With regard to four students that MNIC reported as "homebound," the audit team found that MNIC did not provide sufficient documentation to support their "homebound" designation. For all four, the audit team found that the record lacked sufficient medical documentation to support the designation. Additionally, there was no documentation of any homebound instruction provided by MNIC teachers for any of the four students.

[5] October 2, 2017 was used instead of October 1, 2017 as the enrollment date for compensatory-education-revenue purposes because October 1, 2017 was a Sunday.

findings that MNIC misreported some students' start and end dates, did not properly withdraw students after 15 consecutive absences, reported students as enrolled even though they had no attendance records, and reported students as homebound without providing adequate documentation.

On April 11, 2022, the audit team responded to MNIC's appeal filing. The audit team explained why it determined that MNIC's electronic attendance records were unreliable, including that chronically absent students were all marked "present" on the same day. The audit team also detailed its process for reviewing the manual attendance records to determine MNIC's enrollment for FY 2018. Accordingly, the audit team recommended that the appeal committee affirm the audit team's findings, with one slight adjustment, unless MNIC provided additional documentation to demonstrate the accuracy of its electronic records.[6]

By a letter dated July 14, 2022, MNIC submitted additional information and requested a hearing.[7] In the letter, MNIC described MDE's audit as being conducted for a "non-random purpose." MNIC also provided a new estimate for its ADM for

---

[6] After reviewing the manual attendance records again, the audit team found that one of the students it had identified as "incorrectly reported as enrolled" was removed from the enrollment count "in error." The audit team revised its recommendation accordingly and asked that the appeal committee accept its revised recommendation.

[7] Although MNIC requested a hearing before the appeal committee, no statute or rule provides for a hearing following an appeal of audit findings. *See* Minn. Stat. § 127A.41, subd. 3. Rather, MDE's internal appeal procedures provide that, upon request, the appeal committee must "convene a *meeting*" between the school district or charter school, the audit team, and the appeal committee to review the audit findings and discuss the issues on appeal. (Emphasis added.)

FY 2018: 446. This estimate was based on the observations of MNIC administrators and support staff who informally tracked "MNIC's current enrollment based on their interactions with students both in [MNIC school sites] and in the community." This estimate is smaller than MNIC's reported ADM (520.98) but larger than the audit team's initial calculation of MNIC's ADM (383.70) (which the audit team later amended to 384.82).

On July 27, 2022, the appeal committee held a meeting with MNIC and the audit team to address MNIC's appeal. At the meeting, MNIC admitted that its electronic attendance records "were, at best, suspect," but it stated that its manual attendance records were also unreliable because dozens of students often arrived at school at the same time, making it difficult to ensure that they all signed in properly. And MNIC maintained that the audit findings were erroneous because they were based solely on the manual attendance records. MNIC then explained that it had independently reviewed its attendance records, along with several communications between its administrators, and estimated that its actual ADM for FY 2018 was 446. MNIC suggested that its estimated ADM of 446 for FY 2018 be used for purposes of calculating state aid adjustments.

Toward the end of the meeting, the appeal committee asked MNIC if it had any additional documentation to support its estimated ADM. On August 8, 2022, MNIC submitted classroom attendance records reflecting "daily absences recorded by various teachers for specific class periods." MNIC also noted that "there was no requirement that teachers record daily hourly attendance, so it appears some teachers never entered

10

attendance in this system, some entered it some days but not others, and others entered attendance every day."

After reviewing MNIC's submission, the appeal committee asked MNIC to provide more information, including classroom attendance records reflecting students *in attendance* each day instead of students who were *absent*, a list of teachers who reported classroom attendance each day along with their methods for taking attendance, and "[a]ny other additional information MNIC would like to submit for . . . consideration." The appeal committee gave MNIC until August 29, 2022, to submit the requested documentation and indicated that it would not consider any documentation submitted after that date.

On August 29, 2022, MNIC provided the appeal committee with additional information. With regard to teachers' methods for taking daily attendance, MNIC explained:

> [F]or the *electronic* hourly attendance system, teachers marked absent any student who was listed on the class roster but was not present in class for the class period. Students left blank (*i.e.*, without an absence code) are considered present. As another option, teachers who used *written* hourly attendance record-keeping would make a list of students who were present in class that day and these written lists were then often used to update the daily electronic attendance system. Unfortunately, the paper records were not retained.

MNIC also submitted an analysis of the attendance records for the same 42 students whose electronic and manual attendance records the audit team considered. MNIC's analysis considered these students' classroom attendance records as well. Based on its review of these students' records, MNIC concluded that "none" of MNIC's attendance records were

11

complete, accurate, or reliable. MNIC argued that, because all of its attendance records were unreliable, the appeal committee must ignore the audit team's findings and instead rely on MNIC's estimated ADM for FY 2018.

On September 7, 2022, the audit team responded to MNIC's August 29, 2022, submission. The audit team maintained that the manual attendance records showed actual attendance. The audit team acknowledged that students "may have attended additional days" beyond those dates shown on the manual sign-in sheets but claimed that "MNIC ha[d] not provided . . . sufficient and reliable documentation to show the students were in attendance beyond the documented attendance in the manual sign-in sheets." The audit team explained that the hourly classroom attendance records were not instructive "because not all teachers took hourly attendance and others were not consistent in taking hourly attendance on a daily basis." Accordingly, the audit team recommended that the appeal committee "use the most reliable form of attendance *records* [that] MNIC has provided, the manual sign-in sheets, to calculate each student's ADM" rather than concluding that all of MNIC's attendance records were unreliable, as suggested by MNIC. The audit team noted that accepting MNIC's position "would result in a reduction of [g]eneral [e]ducation [a]id to $0.00" because reliable attendance records are required to calculate ADM.[8]

After considering the evidence in the record and the recommendation of the appeal committee, the commissioner issued a final determination upholding the audit team's

_____

[8] MNIC responded to the audit team's September 7, 2022 letter, but the appeal committee declined to consider this response because it was received after MNIC's August 29, 2022 deadline.

12

findings with one minor adjustment recommended by the audit team. The commissioner concluded that the record supported the audit team's decision to use manual daily sign-in sheets to determine attendance as "they were the only consistent tracking form for the year." The commissioner concluded that neither the electronic attendance records nor the classroom attendance records were reliable due to problems with how these records were kept, as outlined in the audit report and the audit team's responses to MNIC's submissions to the appeal committee. The commissioner also determined that MNIC's estimated ADM was not supported by sufficient evidence and that estimation was not a legally permissible means of calculating ADM or, by extension, state aid. And the commissioner concluded that MNIC had not provided sufficient documentation to support its designation of four students as "homebound." The commissioner noted that MNIC "was given ample opportunity to provide additional student level documentation to support its [a]ppeal," but failed to do so with sufficient detail.

The only change the commissioner made to the original audit findings was to adjust the enrollment status for one student, based on the audit team's recommendation. This change had the effect of increasing the audited enrollment from 458 to 459, resulting in a slight increase in the ADM calculated by the audit team for FY 2018. Using the revised ADM, the commissioner ordered a downward adjustment of $1,350,617.75 to MNIC's state aid—$862,863.99 for FY 2018 general education revenue and $487,753.76 for FY 2019 compensatory education revenue. Given the magnitude of the adjustment, the commissioner indicated that MDE should "work with the school to determine an aid

adjustment schedule that will help mitigate the financial hardship that this adjustment may cause."

MNIC appeals by writ of certiorari.

## ISSUES

I. Does the commissioner of education have the authority under Minnesota Statutes section 127A.41, subdivision 3, to audit the records of a charter school for purposes of verifying pupil counts and aid entitlements?

II. Is the commissioner's authority under Minnesota Statutes section 127A.41, subdivision 3, separate from and not limited by the commissioner's authority under Minnesota Statutes section 127A.42?

III. Is the commissioner's final determination upholding the audit findings supported by substantial evidence and not arbitrary?

## ANALYSIS

Our scope of review of agency decisions is narrow. *Indep. Sch. Dist. No. 281 v. Minn. Dep't of Educ.*, 743 N.W.2d 315, 321 (Minn. App. 2008). Agency decisions enjoy a presumption of correctness, and we defer to agencies' expertise and special knowledge. *Id.* We will not reverse an agency decision unless it was made in excess of an agency's statutory authority, it reflects an error of law, the determinations are arbitrary or capricious, or the findings are unsupported by the evidence. *Id.*; *In re Qwest's Wholesale Serv. Quality Standards*, 702 N.W.2d 246, 248, 262 (Minn. 2005) (reversing an agency order where the order was in excess of the agency's statutory authority).[9]

_____

[9] We do not apply the contested-case appeal provisions of the Minnesota Administrative Procedure Act (MAPA), Minn. Stat. §§ 14.63-.69 (2022), because we discern no legal or constitutional right to a hearing before the commissioner's decision on an audit. *See* Minn. Stat. §§ 14.02, subd. 3 (defining contested case as "a proceeding before an agency in which the legal rights, duties, or privileges of specific parties are required by law or constitutional

14

MNIC challenges the commissioner's final decision on multiple grounds. MNIC asserts that MDE exceeded its statutory authority by auditing MNIC under section 127A.41, subdivision 3, because (1) as a matter of law, MDE does not have the authority to audit the records of charter schools under that statutory provision, and (2) under the facts of this case, MDE should have acted under section 127A.42, instead of section 127A.41, subdivision 3. In the alternative, MNIC contends that the commissioner's final determination upholding the audit findings is arbitrary and not supported by substantial evidence. MDE argues that MNIC did not raise below any arguments regarding MDE's authority to conduct the audit under section 127A.41, subdivision 3, and that MNIC has therefore forfeited these arguments. MDE also asserts that the commissioner's final determination is not arbitrary and is supported by substantial evidence.

We begin by considering whether MNIC's arguments pertaining to MDE's authority to conduct the audit under section 127A.41, subdivision 3, are properly before this court. "A reviewing court must generally consider only those issues that the record shows were presented [to] and considered by the [decision-maker] in deciding the matter before it." *Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988) (quotation omitted); *see also In re A.D.*, 883 N.W.2d 251, 261 (Minn. 2016) (discussing this forfeiture analysis in

___

right to be determined after an agency hearing"), .63 (authorizing certiorari appeal from a final decision in a contested case), 127A.41, subd. 3 (directing commissioner to adopt audit procedures and exempting those procedures from rulemaking requirements of MAPA) (2022). But we note that the MAPA "scope of review is similar to the common law scope of review on certiorari." *Staeheli v. City of St. Paul*, 732 N.W.2d 298, 304 n.1 (Minn. App. 2007).

the certiorari-appeal context).  But this rule is not "ironclad."  *Oanes v. Allstate Ins. Co.*, 617 N.W.2d 401, 403 (Minn. 2000).  "[D]efects in subject matter jurisdiction can be raised at any time and cannot be waived by the parties."  *Nelson v. Schlener*, 859 N.W.2d 288, 291 (Minn. 2015); *see In re Hibbing Taconite Mine & Stockpile Progression*, 888 N.W.2d 336, 344 (Minn. App. 2016) (citing *Nelson*, 859 N.W.2d at 291-92).

Whether an agency has statutory authority to make a decision is considered a jurisdictional question.  *See Senior Citizens Coal. of Ne. Minn. v. Minn. Pub. Utils. Comm'n*, 355 N.W.2d 295, 302 (Minn. 1984) ("A lack of statutory authority betokens a lack of jurisdiction." (quotation omitted)).  Therefore, the issue of whether an agency has statutory authority—jurisdiction—to make a certain decision cannot be forfeited.  *Hibbing Taconite Mine*, 888 N.W.2d at 344.  Accordingly, we will address in full both of MNIC's arguments regarding MDE's authority to audit MNIC under section 127A.41, subdivision 3, before turning to MNIC's argument that the commissioner's final determination regarding the audit results is arbitrary and lacks evidentiary support in the record.

## I.     The commissioner of education has the authority under Minnesota Statutes section 127A.41, subdivision 3, to audit records of charter schools for purposes of verifying pupil counts and aid entitlements.

"Administrative agencies are creatures of statute and they have only those powers given to them by the legislature."  *In re Hubbard*, 778 N.W.2d 313, 318 (Minn. 2010).  An agency's authority may be either expressly granted by legislation or implied by the agency's expressed powers.  *Id.*  If an agency acts outside the bounds of its statutory authority, its action is generally void.  *Rowe v. Dep't of Emp. & Econ. Dev.*,

16

704 N.W.2d 191, 194 (Minn. App. 2005). "Whether an administrative agency has acted within its statutory authority is a question of law that we review de novo." *Hubbard*, 778 N.W.2d at 318.

MNIC argues that MDE and the commissioner exceeded their statutory authority by auditing MNIC's attendance records under section 127A.41, subdivision 3, because that statutory provision applies only to school districts, not to charter schools. MDE counters that charter schools are subject to the audit procedures and requirements of section 127A.41, subdivision 3, by operation of Minn. Stat. § 124E.16, subd. 1(a) (2022). This dispute requires us to consider not only section 127A.41, subdivision 3, the statute at the center of this case, but also chapter 124E, which governs charter schools. The construction of a statute presents a question of law, which we review de novo. *Rowe*, 704 N.W.2d at 194.

When interpreting a statute, we aim to give effect to the legislature's intent. *Walsh v. State*, 975 N.W.2d 118, 122 (Minn. 2022); *see also* Minn. Stat. § 645.16 (2022) (providing considerations for determining legislative intent). To do so, we first consider whether the language of the statute is plain—that is, subject to only one reasonable interpretation. *Walsh*, 975 N.W.2d at 122. When analyzing statutory language, we read the statute as a whole, giving effect to all of its provisions whenever possible. *Am. Fam. Ins. Grp. v. Schroedl*, 616 N.W.2d 273, 277 (Minn. 2000). Our analysis may involve consideration of surrounding statutes, particularly when the statute in question is situated within a set of laws that form a "coherent legislative policy." *Resol. Relating to Termin'n of Prob'y Tchr.*, 986 N.W.2d 251, 254 (Minn. App. 2023) (quoting *State by Smart Growth*

*Minneapolis v. City of Minneapolis*, 954 N.W.2d 584, 591 (Minn. 2021)). In these instances, we "discern the plain meaning of the statute by reading it 'in harmony' with the other components of the policy." *Id.* (quoting *Smart Growth Minneapolis*, 954 N.W.2d at 591). When the statutory language in question is plain, we apply that interpretation. *Walsh*, 975 N.W.2d at 122. If statutory language is ambiguous—meaning susceptible to more than one reasonable interpretation—we ascertain legislative intent by considering canons of statutory construction. *Spann v. Minneapolis City Council*, 979 N.W.2d 66, 73 (Minn. 2022); *see* Minn. Stat. § 645.16.

We begin our statutory analysis in this case by recognizing that the legislature has expressly provided that charter schools are "exempt from all statutes and rules applicable to a school, school board, or school district *unless* a statute or rule is made specifically applicable to a charter school or is included in this chapter." Minn. Stat. § 124E.03, subd. 1 (emphasis added). We next consider the language of section 127A.41, subdivision 3, which authorizes the commissioner to conduct audits to ensure that state aid entitlements are commensurate with actual student enrollment. The relevant statutory language provides that "[t]he commissioner shall establish procedures for conducting and shall conduct audits of district records and files for the purpose of verifying district pupil counts, levy limitations, and aid entitlements." Minn. Stat. § 127A.41, subd. 3. The subdivision further provides that the commissioner "shall order increases or decreases" in state aid to address disparities, if any, "between pupil counts, levy limitations, or aid entitlements determined by audit." *Id.* As MNIC correctly notes, section 127A.41, subdivision 3, does not refer to charter schools. It refers only to "districts." *Id.*

18

But our inquiry does not end with section 127A.41, subdivision 3. We also must consider whether any provision of chapter 124E makes charter schools subject to the same audit requirements as school districts. We conclude that one section of chapter 124E does so. Section 124E.16, subdivision 1(a), provides that "[a] charter school is subject to the *same* financial audits, audit procedures, and audit requirements *as a district*, except as required by this subdivision." (Emphasis added.) By providing that a charter school is subject to the same audit procedures and requirements as a district, the legislature specifically subjected charter schools to section 127A.41, subdivision 3, which sets forth the audit procedures and requirements applicable to a district for purposes of verifying pupil counts and state aid entitlements. Taken together, these statutes plainly establish that the commissioner has the authority to audit the records of charter schools under section 127A.41, subdivision 3.

We are not persuaded otherwise by MNIC's alternative reading of the relevant language of section 124E.16, subdivision 1(a). MNIC contends that the language subjecting charter schools "to the same financial audits, audit procedures, and audit requirements as a district" merely dictates how charter schools must conduct their "own annual fiscal audit[s]" and does not subject them to audits under section 127A.41, subdivision 3. To support its argument, MNIC relies on language in subdivision 1(b) of section 124E.16. Subdivision 1(b) requires charter schools to "submit an *audit report* to the commissioner and its authorizer annually by December 31." Minn. Stat. § 124E.16, subd. 1(b) (2022) (emphasis added). MNIC contends that the language of subdivision 1(a) relates solely to the audit report required by subdivision 1(b) and not to audits by the

19

commissioner referred to in section 127A.41, subdivision 3. This argument is inconsistent with the plain language of subdivision 1(a).

The relevant language of subdivision 1(a) is much broader than the reading urged by MNIC. Again, subdivision 1(a) provides that "[a] charter school is subject to the same *financial audits*, *audit procedures*, and *audit requirements* as a district." *Id.*, subd. 1(a) (emphasis added). Additionally, subdivision 1(a) expressly authorizes the commissioner to "conduct financial, program, or compliance audits" of charter schools. *Id.* The express authorization for the commissioner to conduct "audits" of charter schools, together with the use of plural nouns (audits, procedures, and requirements), reflect that subdivision 1(a) is not limited in the manner that MNIC urges. The only logical reading of subdivision 1(a) subjects charter schools to audits by the commissioner—including the same audits of pupil counts and aid entitlements to which districts are subject under section 127A.41, subdivision 3.

The conclusion that section 127A.41, subdivision 3, applies to charter schools by operation of section 124E.16, subdivision 1(a), is reinforced by other provisions of the Education Code—notably, those that address the distribution of state aid to charter schools in chapter 124E. Several provisions governing the distribution of state aid to school districts specifically apply to charter schools. For instance, MDE must distribute general education revenue and "other aids, grants, and revenue according to chapters 120A to 129C" to each charter school "as though it were a district." Minn. Stat. §§ 124E.20, subd. 1(a), .24(a), (c); *see* Minn. Stat. § 126C.10 (2022) (detailing how general education revenue is distributed). And, as discussed above, MDE distributes general and

compensatory education aid to school districts based on pupil counts. *See* Minn. Stat. §§ 126C.05, subds. 1, 3, 5, 8, .10, subds. 1-2e, 3.

By requiring MDE to distribute state aid to charter schools as though they are school districts and by subjecting charter schools to the same financial audit procedures and requirements as school districts, the legislature authorized MDE not only to disburse state aid to charter schools *but also* to ensure that such disbursements are made consistent with state law. *See* Minn. Stat. §§ 124E.16, subd. 1(a), .20, subd. 1(a), .21, subd. 1(a), .24(a), (c) (2022). In other words, the statutory scheme governing the distribution and oversight of state aid to school districts and charter schools shows that the legislature intended to pair the commissioner's obligation to distribute state aid to schools based on enrollment with the concomitant authority to ensure that schools are accurately reporting their enrollment. Thus, reading section 127A.41, subdivision 3, in harmony with section 124E.16, subdivision 1(a), to apply to charter schools is the only reasonable interpretation, in light of the framework for state aid set forth in the Education Code. *See* Minn. Stat. §§ 126C.10, 124E.16, .20, .21, .24 (2022); *Schroedl*, 616 N.W.2d at 277-78; *Smart Growth Minneapolis*, 954 N.W.2d at 590-91.[10]

_____

[10] MNIC also argues that the "law of the case" requires us to conclude that MDE does not have the authority to audit the records of charter schools under section 127A.41, subdivision 3. MNIC points to our order denying MNIC's motion to stay the commissioner's final determination while this appeal was pending. "The 'law of the case' doctrine . . . provides that[,] when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *In re Welfare of M.D.O.*, 462 N.W.2d 370, 375 (Minn. 1990) (emphasis omitted) (quotation and citation omitted). The "law of the case" doctrine does not apply "where the issue has not yet been litigated or decided at trial or on appeal." *Id.* at 376. In our decision denying MNIC's motion to stay, we determined, in relevant part, that a charter school is not a "school

In sum, we hold that the plain language of section 127A.41, subdivision 3, when read in conjunction with section 124E.16, subdivision 1(a), expressly grants the commissioner authority to audit the records of charter schools in the same manner as school districts for purposes of verifying pupil counts and state aid entitlements. *See Walsh*, 975 N.W.2d at 122; *Hubbard*, 778 N.W.2d at 320. Accordingly, we conclude that the commissioner and MDE did not exceed their statutory authority by auditing MNIC's attendance records and ordering adjustments to state aid based on the audit results.

II.    **The authority of the commissioner under Minnesota Statutes section 127A.41, subdivision 3, is separate from and not limited by the commissioner's authority under Minnesota Statutes section 127A.42.**

MNIC also contends that MDE exceeded its statutory authority by acting under the wrong statute. MNIC characterizes MDE's audit as a "criminal investigation" and asserts that such "investigations" must be conducted under section 127A.42, which applies when the commissioner has reason to believe that a violation of law "is occurring." Minn. Stat. § 127A.42, subd. 4. MNIC also maintains that, by proceeding under section 127A.41, subdivision 3, rather than section 127A.42, MDE denied MNIC the additional "due process protections" afforded by section 127A.42. MNIC's arguments are unavailing for several reasons.

First, MNIC's assertion that MDE conducted a "criminal investigation" is not supported by the record. The record shows that MDE conducted an audit to verify MNIC's

district" exempt from the requirement of posting security to obtain a stay pending appeal under Minn. Stat. § 574.18 (2022). In so doing, we interpreted section 574.18—we *did not* interpret section 127A.41, subdivision 3. Thus, MNIC's assertion that our earlier order somehow constrains our interpretation of section 127A.41, subdivision 3, is not persuasive.

22

pupil counts and aid entitlements under section 127A.41, subdivision 3, rather than an investigation into potential fraud, notwithstanding that MDE initiated the audit after a citizen complained about MNIC's recordkeeping practices. Moreover, as MDE correctly notes, the Education Code does not authorize MDE to conduct criminal investigations or prosecutions. *See* Minn. Stat. §§ 120A.01-129C.27 (2022). By contrast, as discussed above, the commissioner and MDE do have express statutory authority to audit the records of charter schools under section 127A.41, subdivision 3. Thus, MDE acted within its express statutory authority when it initiated the audit of MNIC based on a citizen complaint.

Second, MDE was not required to act under section 127A.42 rather than section 127A.41, subdivision 3. The plain language and purposes of these two statutes compel this conclusion. Section 127A.41 authorizes the commissioner to "supervise distribution of state aids and grants in accordance with law." Minn. Stat. § 127A.41, subd. 1. As discussed above, part of the supervisory role involves establishing audit procedures and conducting audits pursuant to those procedures to ensure that state aid entitlements match actual enrollment at districts and charter schools. *Id.*, subd. 3. The commissioner selects districts to audit based on several criteria, including whether a citizen has requested an audit by submitting a complaint to the MDE. Nothing in section 127A.41, subdivision 3, precludes an audit when there were allegations of fraudulent recordkeeping or manipulation of attendance records, as there were in this case. *See id.*, subds. 1-10. And, if an audit by MDE reveals disparities in a district's "pupil counts, levy limitations, or aid

entitlements," the commissioner must "order increases or decreases accordingly." *Id.*, subd. 3.

By contrast, section 127A.42 authorizes the commissioner to address certain violations of law by reducing state aid to a district if a violation is not corrected within a specified period of time. Minn. Stat. § 127A.42, subds. 2, 4, 6. Those violations include: employing an unlicensed teacher, failing to comply with a mandatory rule of general application, maintaining an unauthorized rental contract, violating the Minnesota Constitution or antidiscrimination laws, failing to educate a resident student, or using funds contrary to their statutory purpose. *Id.*, subd. 2. Section 127A.42 is triggered when "it appears that a violation [of law] *is occurring* in a district." *Id.*, subd. 4 (emphasis added). At that point, the commissioner must notify the school board of the district. *Id.* The school board has a right to dispute the alleged violation during a hearing. *Id.*, subd. 5. If the violation is corrected within the appropriate timeframe, the commissioner will not reduce the state aid. *Id.*, subd. 6. If the violation is not corrected, the commissioner "may reduce or withhold the district's state aid." *Id.*, subds. 2, 6. These provisions of section 127A.42 apply to charter schools. Minn. Stat. § 124E.25, subd. 3. More importantly for purposes of this appeal, there is no language in section 127A.42 that limits the commissioner's audit authority under section 127A.41, subdivision 3, in any way. *See* Minn. Stat. § 127A.42.

Third, MNIC's preference for the process outlined in section 127A.42 does not support the conclusion that MDE lacked the authority to proceed under section 127A.41, subdivision 3, nor does it suggest that MDE violated MNIC's due-process rights by doing so. Because MDE proceeded under section 127A.41, subdivision 3, rather than

section 127A.42, MNIC was not statutorily entitled to the procedures afforded under section 127A.42. And MNIC has not argued that the process it received under section 127A.41—notice, an opportunity to be heard, and the right to appeal—fail to satisfy requirements of due process. Thus, MNIC's due-process arguments are unavailing.

Finally, it is not clear that MDE could have acted under section 127A.42 based on the record in this case. While it is true that section 127A.42 requires the commissioner to notify a school district or charter school of certain violations of law within the district or charter school, this notice requirement applies only "when it appears that a violation is occurring." *Id.*, subd. 4. Here, MDE did not find that MNIC's attendance recordkeeping practices constituted a "violation" within the meaning of section 127A.42. Moreover, although MDE audited MNIC's past attendance recordkeeping practices, MDE expressed no opinion as to whether those practices were ongoing. Because it is not clear that there was an ongoing violation within the scope of section 127A.42, we are not persuaded by MNIC's argument that MDE was required to proceed under that section.

In sum, MDE did not exceed its statutory authority by auditing MNIC under section 127A.41, subdivision 3, instead of acting under section 127A.42.

III. **The commissioner's final determination upholding the audit findings is not arbitrary and is supported by substantial evidence.**

Lastly, MNIC argues that the commissioner's final determination upholding the audit findings is arbitrary and not supported by substantial evidence. We may reverse a quasi-judicial agency decision if it is arbitrary and capricious. *See Indep. Sch. Dist. No. 281*, 743 N.W.2d at 327. An agency decision is arbitrary and capricious if there is no

25

"rational connection between the facts found and the choice made." *In re Excess Surplus Status of Blue Cross & Blue Shield of Minn.*, 624 N.W.2d 264, 277 (Minn. 2001) (quotation omitted). Stated differently, an agency decision is arbitrary and capricious if it reflects "the agency's will and not its judgment." *In re Denial of Contested Case Hearing Requests & Issuance of NPDES/SDS Permit No. MN0071013*, 993 N.W.2d 627, 646 (Minn. 2023) (quotation omitted). "In applying the arbitrary and capricious standard, we consider whether a combination of danger signals suggests that the agency has not taken a hard look at the salient problems and has not genuinely engaged in reasoned decision-making." *Id.* at 646-47 (quotations omitted).

We may also reverse a quasi-judicial agency decision if it is not supported by substantial evidence. *In re Application of N. Metro Harness, Inc.*, 711 N.W.2d 129, 134, 137 (Minn. App. 2006), *rev. denied* (Minn. June 20, 2006). Substantial evidence is "(1) such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; (2) more than a scintilla of evidence; (3) more than some evidence; (4) more than any evidence; or (5) the evidence considered in its entirety." *Indep. Sch. Dist. No. 281*, 743 N.W.2d at 327 (quotation omitted). When applying the substantial-evidence test, we evaluate the evidence relied on by the agency in view of the record as a whole. *Id.* As long as the agency engaged in reasoned decision-making, we will affirm, even if we may have reached a different conclusion had we been the fact-finder. *Id.* The relator has the burden of proving that the challenged agency findings are not supported by substantial evidence. *N. Metro Harness*, 711 N.W.2d at 137.

MNIC raises three arguments to support its contention that the commissioner's final determination upholding the audit findings is arbitrary and is not supported by substantial evidence. We consider each argument in turn.

*MNIC's "Testimony" Regarding Its Attendance Records*

MNIC first contends that the commissioner "arbitrarily ignored" MNIC's "testimony" about its attendance records and thereby violated "general audit procedures." Specifically, MNIC contends that the commissioner ignored the statements of a MNIC administrator that called into question the audit team's reliance on the manual attendance records for purposes of calculating MNIC's FY 2018 enrollment and ADM.

This argument is unavailing. As a preliminary matter, the "testimony" to which MNIC refers consists of statements made by a MNIC administrator during the July 27, 2022 meeting attended by the audit team, the appeal committee, MNIC administrators, and MNIC's counsel. The transcript of this meeting is part of the administrative appeal record that the commissioner considered, and MNIC does not provide any support for its assertion that the commissioner did not consider it when rendering a final decision. Moreover, in the final decision, the commissioner provided detailed reasons for upholding the audit finding that the manual attendance records are the most reliable records available from MNIC for determining attendance for FY 2018, notwithstanding the "testimony" by MNIC's administrator. Accordingly, MNIC's assertion that the commissioner arbitrarily ignored MNIC's "testimony" is unpersuasive.

*MNIC's Manual Attendance Records*

MNIC relatedly argues that the commissioner's final decision is not supported by substantial evidence because MNIC's manual attendance records for FY 2018 are not "accurate, complete, or reliable." MNIC further asserts that *none* of its attendance records for FY 2018 are reliable, given its "systemic issues with attendance reporting" that year, and that the commissioner therefore should have accepted MNIC's estimated ADM for FY 2018. We are not persuaded.

The audit team explained that the FY 2018 manual attendance records were a reliable source of student attendance data for MNIC because they were "source documents" for the electronic records and were generated through an in-person sign-in process that was overseen by MNIC staff. This conclusion is supported by the record, which reflects that MNIC told the audit team early in the process that MNIC's manual daily sign-in sheets were source documents for MNIC's electronic records. While MNIC later maintained that the manual attendance records were not the sole source for MNIC's electronic attendance records, the audit team's review of the documents provided by MNIC persuaded the audit team and the commissioner that the manual attendance records were the most reliable.

The audit team reviewed thousands of pages of manual daily sign-in sheets, classroom attendance records, and electronic attendance records, and determined that the manual attendance records were the only reliable source of attendance data due to discrepancies in both the electronic and classroom attendance records. For example, in the electronic records, the audit team found several instances where students who were consistently marked absent for a number of days were then marked present on the same

day (presumably to prevent these students from being withdrawn). With regard to the hourly classroom attendance records, not all MNIC teachers maintained those records and the teachers who did were not always consistent in entering daily attendance. Moreover, the hourly classroom attendance records generally reflected only students marked absent; they did not indicate which students were actually "present." Finally, during the appeal process, MNIC did not provide any other documentation from which actual attendance for FY 2018 could be established despite being given multiple opportunities to do so. Thus, the commissioner's decision to accept the audit team's use of manual attendance records to calculate MNIC's enrollment and ADM for FY 2018 is supported by substantial evidence.

Moreover, as MDE correctly points out, MNIC's suggestion that the commissioner should have accepted MNIC's estimated ADM in place of the audited ADM is contrary to law. As previously discussed, a charter school's annual general education revenue depends on the school's ADM. Minn. Stat. §§ 124E.20, subd. 1, 126C.05, subds. 1, 5, 8(a), 126C.10. ADM depends on how many days each student is enrolled at the school during the school year. Minn. Stat. § 126C.05, subd. 8(a); *see* Minn. Stat. § 124E.20, subd. 1 (making section 126C.10 applicable to charter schools). And enrollment for each student is "counted from the date of entry until withdrawal." Minn. Stat. § 126C.05, subd. 8(a). Therefore, by statute, ADM is based on each student's actual attendance as reflected in individual student records. *See id.*; Minn. Stat. § 127A.41, subd. 5 (requiring "a record of each pupil's daily attendance"). But MNIC's estimate is based on the anecdotal observations of MNIC administrators and staff, not on actual attendance records. MNIC's

reliance on its estimated ADM for FY 2018 is therefore misplaced, and substantial evidence in the record supports the commissioner's decision to uphold the audit finding that the manual attendance records are the most reliable records for purposes of calculating enrollment and ADM during the relevant time period.

*Documentation for Reportedly Homebound Students*

Lastly, MNIC contends that the commissioner's final decision regarding the audit findings on "homebound" students is arbitrary and is not supported by substantial evidence because the audit team improperly relied on and misinterpreted MDE's MARSS Manual when it determined that MNIC did not provide adequate documentation for four reportedly homebound students. Again, we disagree.

The commissioner's final determination regarding the "homebound" students is supported by substantial evidence. According to the MARSS Manual, a charter school seeking to claim general education revenue based on homebound instruction must provide adequate documentation that such instruction is necessary and is being provided on a regular basis. For audit purposes, the school must provide for each homebound student: (1) written verification from a medical authority confirming the student's confinement to the home and (2) records that show the dates of each homebound visit and the number of hours of instruction provided during each visit. The record contains no documentation from MNIC of homebound instruction for any of the four students. The lack of evidence of any homebound instruction is sufficient to support the commissioner's conclusion that MNIC did not provide adequate documentation on the four students involved. We therefore conclude that substantial evidence supports the commissioner's

final determination upholding the audit finding that MNIC lacked adequate documentation to support its classification of four students as "homebound" for enrollment purposes.

We are not persuaded otherwise by MNIC's assertion that the audit team arbitrarily relied on the "MARSS Data Elements" section of the MARSS Manual. The MARSS Manual is a collection of reporting procedures adopted by MDE pursuant to the commissioner's express statutory authority to "adopt internal procedures for administration and monitoring of [school] aids and grants" and for conducting audits in that context. Minn. Stat. § 127A.41, subds. 1, 3. Because the "MARSS Data Elements" section of the MARSS Manual was developed pursuant to the commissioner's express statutory authority to adopt internal auditing procedures, we discern no error in either the audit team's reliance on the MARSS Data Elements or the commissioner's final determination upholding the audit findings. MNIC does not cite, and we are not aware of, any authority that would lead us to a contrary conclusion.

In sum, we conclude that the commissioner's final determination on MNIC's appeal of the audit findings is not arbitrary or unsupported by substantial evidence.

## DECISION

Minnesota Statutes section 127A.41, subdivision 3, when read in conjunction with Minnesota Statutes section 124E.16, subdivision 1(a), authorizes the commissioner of education to audit the records of a charter school for the purpose of verifying pupil counts and state aid entitlements and to order adjustments in state aid based on the audit results. The authority of the commissioner under section 127A.41, subdivision 3, to conduct audits and to order increases and decreases to state aid entitlements accordingly is separate from

31

and not limited by the commissioner's authority to reduce or withhold state aid for violations of law under Minnesota Statutes section 127A.42. Because the commissioner had authority under section 127A.41, subdivision 3, to audit the attendance records of MNIC and to decrease MNIC's state aid entitlement accordingly, and because the commissioner's final determination upholding the audit team's findings and recommendations is not arbitrary and is supported by substantial evidence, we affirm.

**Affirmed.**